IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | Criminal No. 3:25-CR-0519-K |
| | § | |
| JARED MAURICE KIMBLE, PADEN JACOBY FREENEY, BRENTON WILLIAM FREENEY and LESTER LEROY FREENEY II, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION & ORDER**

Before the Court is Defendants Brenton William Freeney and Lester Leroy Freeney II's Joint Motion to Suppress Evidence (the "Motion") (Doc. No. 67). The Court held a hearing on the Motion on September 16, 2026. After considering the Motion, the response to the Motion (Doc. No. 68), the arguments, testimony, and evidence presented at the suppression hearing, and the applicable law, the Court **DENIES** the Motion. Because Brenton Freeney voluntarily consented to the officers' entry into Sonesta Hotel Room #726 to look for people, and because the officers saw contraband in plain view while acting within the scope of that consent, the evidence recovered from that room will not be suppressed. The Court does not reach the Government's alternative argument that exigent circumstances justified the entry.

## I. Findings of Fact and Background

The Motion seeks to suppress evidence recovered from Room #726 at the Sonesta Hotel ("Room #726") on grounds that the search violated the Fourth

Amendment. This case involves four defendants; however, only Defendants Brenton William Freeney and Lester Leroy Freeney II (together, the "Movants") move to suppress. The evidence recovered from Room #726 included marijuana, fentanyl, cocaine, and methamphetamine. Based on the testimony and exhibits admitted at the hearing, *see generally* Hearing Transcript (Doc. No. 77), the Court finds the following facts, *see* FED. R. CRIM. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").

In April 2025, law enforcement began investigating a local drug trafficking organization (the "DTO") suspected of trafficking narcotics such as cocaine, methamphetamine, and fentanyl. Law enforcement's investigation revealed a number of overdoses from fentanyl, including an overdose involving a young mother and her infant child in Kaufman, Texas, *see* Doc. No. 77 at 74, as well as an overdose on Sinclair Avenue in Dallas, Texas, *see id.* at 13. Law enforcement suspected Paden Freeney—one of the other co-defendants in this case—was involved with the DTO as a trafficker.

On October 15, 2025, law enforcement obtained a warrant to arrest Paden Freeney. The same day, law enforcement learned from Jared Kimble—also a co-defendant—that Brenton Freeney had paid for a hotel room at the Sonesta Hotel. Law enforcement converged on the Sonesta Hotel in hopes of finding Paden Freeney.

Upon arrival, law enforcement observed Paden Freeney exit the Sonesta Hotel. Paden Freeney was joined by Brenton and Lester Freeney. The three entered a vehicle. Law enforcement converged on the vehicle and ordered the three men to exit. Paden

Freeney was arrested pursuant to the warrant and Brenton and Lester Freeney were detained in handcuffs.

While detained, DEA Task Force Officer Franco (the "TFO") asked Brenton Freeney if Brenton had a key to the hotel room. Brenton Freeney indicated he had a key, located in his front left shorts pocket. Law enforcement retrieved the key and asked whether anyone else was in the room. Brenton Freeney indicated there was no one else in the room.

The TFO then asked Brenton Freeney whether he would give law enforcement permission "to go in there and look to make sure there is nobody in there." The TFO told Brenton Freeney he was concerned that someone inside could be overdosing. The TFO testified that this concern arose because a young infant had previously overdosed on fentanyl traced to Defendants, Doc. No. 77 at 73–74 (all citations herein are to the ECF assigned page number), and the Court credits that testimony. Brenton Freeney again said that "ain't nobody in there."

Law enforcement responded by asking again whether Brenton Freeney would give them permission to "go look for bodies." When Brenton Freeney did not immediately respond, law enforcement said, "I'll tell you what we are going to do. We are going to go in there and look and make sure nobody is dying and then we are going to come back out and get a warrant. Either way we are getting in the room." While saying this, law enforcement approached Brenton Freeney in what Movants characterize as an "intimidating fashion." Having reviewed the video, the Court finds

that law enforcement did not raise their voices, brandish their weapons, or touch Brenton Freeney. *See* Gov. Ex. 2 at 7:20–7:50. Brenton Freeney then shrugged his shoulders, tilted his head to the side, and then nodded his head up and down. The TFO testified that he interpreted this as consent to enter the room, Doc. No. 77 at 96–97, and the Court credits that testimony.

After the exchange with Brenton Freeney, three law enforcement officers—including the TFO—approached the room. Officers first knocked on Room #726's door and no one answered. The TFO then used the key obtained from Brenton Freeney to open the door. Officers entered Room #726 and began clearing it.

Movants contend that officers had already cleared the entire room when one officer walked to the far end of the living room where he saw marijuana in a backpack. The Government contends that the far end of the living room was missed on the initial pass and could have concealed a person who had overdosed. The Court resolves this dispute in the Government's favor. Having reviewed the body-cam footage and considered the testimony at the suppression hearing, the Court finds that (1) on their initial pass, officers checked the bedroom, bathroom, kitchen, and open portion of the living room but did not walk to, or have a clear line of sight into, the far end of the living room; (2) that area was large enough to conceal a human body and was partially obstructed by the couch; and (3) the officer walked to the far end of the living room to check it for a person approximately 45 seconds after entry, before all officers had finished looking for people. *See* Gov. Ex. 1 at 5:25–6:50. The Court also notes that law

enforcement were not only searching for adult-sized bodies but also smaller bodies, given that a young infant had previously overdosed on fentanyl traced to Defendants. *See* Doc. No. 77 at 74.

While at the far end of the living room, an officer observed open backpacks. Marijuana was clearly visible inside. *See* Doc. No. 68 at 7 (image of open backpacks containing marijuana). Officers then left the room. They eventually obtained a search warrant for Room #726 and, in executing it, found distribution quantities of narcotics in the room, including fentanyl, cocaine, and methamphetamine.

## II. Legal Analysis

Movants ask the Court to suppress the evidence found in Room #726 on grounds that it violated Movants' Fourth Amendment rights. *See generally* Doc. No. 67. Movants claim that Brenton Freeney did not voluntarily consent, and even so, law enforcement's search exceeded that consent. *Id.* at 7. In the alternative, Movants also argue that there was no exigency justifying a warrantless entry into Room #726. *Id.* In response, the Government claims that Brenton Freeney did voluntarily consent, that there was an exigency, and that the Government's search did not exceed Brenton Freeney's consent nor did it outlast the exigency. *See generally* Doc. No. 68. For the following reasons, the Court agrees with the Government as to the issue of consent. Therefore, the Motion is **denied**.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "Searches and seizures inside a home without a warrant are

presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation modified), and a hotel guest enjoys the same protection in his or her room, *see Stoner v. California*, 376 U.S. 483, 490 (1964). When evidence is obtained in violation of the Fourth Amendment, the exclusionary rule may bar the Government from using it. *See Davis v. United States*, 564 U.S. 229, 231–32 (2011); *United States v. Calandra*, 414 U.S. 338, 347 (1974). However, "the exclusionary rule is a disfavored judge-made remedy which should be used only as a 'last resort.'" *United States v. Leonard*, 167 F.4th 284, 287 (5th Cir. 2026) (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)) (citation modified).

The warrant requirement is subject to exceptions. The Government here urges that it did not need a warrant to search Room #726 because (1) Brenton Freeney voluntarily consented to the search; and (2) exigent circumstances justified a warrantless entry. *See generally* Doc. No. 68. The Court does not reach the exigent circumstances argument because it concludes that Brenton Freeney voluntarily consented to the search and the search did not exceed the scope of Mr. Freeney's consent.

**A. Brenton Freeney consented to a search for people in Room #726.**

To rely on consent, "the government must demonstrate that there was (1) effective consent, (2) voluntarily given, (3) by a party with actual or apparent authority." *United States v. Malagerio*, 49 F.4th 911, 915–16 (5th Cir. 2022) (citing *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)). The search also must not

exceed the scope of the consent received. *United States v. Staggers*, 961 F.3d 745, 756 (5th Cir. 2020). Movants have never disputed that Brenton Freeney had authority to consent to the search of Room #726, "so only the first and second prongs are at issue," *Malagerio*, 49 F.4th at 917, as well as whether law enforcement exceeded the scope of consent.

Before determining whether Brenton Freeney voluntarily consented, the Court must first determine whether he communicated consent to law enforcement at all. Consent "does not need to be explicit" but "can be inferred from silence or failure to object to a search only if that silence follows a request for consent." *Staggers*, 961 F.3d at 756 (citing *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996)). "Consent may also be inferred from actions that reasonably communicate consent." *Id.* (citing *United States v. Lewis*, 476 F.3d 369, 381 (5th Cir. 2007)). The Government's burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968); *see also Jaras*, 86 F.3d at 390 ("It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent."). When the evidence on whether a gesture communicates consent conflicts, the district court must resolve the conflict. *See Staggers*, 961 F.3d at 757 (vacating and remanding where the district court treated an occupant's failure to object as consent without resolving conflicting testimony about whether she had opened the door and stepped aside).

The Court finds that Brenton Freeney communicated consent to law enforcement by nodding his head up and down. Video footage demonstrates this consent: after the TFO twice asked Brenton Freeney for permission to look inside the room for people, and then told him that officers would get into the room "either way," Brenton Freeney shrugged his shoulders and nodded his head up and down. Gov. Ex. 2 at 7:20–7:50.

Movants argue that this gesture was mere acquiescence to the "either way" statement. The Court disagrees and finds that the nod was an affirmative answer to the TFO's pending request for permission. The nod came within seconds of the TFO's request to enter Room #726, while it remained unanswered; a nod is a commonly understood gesture of assent, unlike the shrug that preceded it; Brenton Freeney had already volunteered the location of the room key and had answered every question the officers asked; and when officers walked away from Brenton Freeney and toward Room #726 with his key, he did not object. Furthermore, as explained in Part II.B.5 below, the record shows that he understood the officers' questions and had the capacity to consent. The Court therefore finds that Brenton Freeney, through non-verbal conduct, affirmatively consented to the officers' entry into Room #726 to look for people. Whether that consent was voluntary—a separate question that accounts for the "either way" statement—is addressed next.

**B. Brenton Freeney's consent was voluntarily given.**

Brenton Freeney's consent was also voluntarily given. A warrantless search is permissible when the government obtains voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper*, 391 U.S. at 550. The Government must carry that burden by a preponderance of the evidence. *United States v. Hurtado*, 905 F.2d 74, 75 (5th Cir. 1990).

In the Fifth Circuit, courts consider six factors when determining whether consent was voluntarily given: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief about whether incriminating evidence would be found. *United States v. Soriano*, 976 F.3d 450, 455 (5th Cir. 2020). "Although all six factors are relevant, no single factor is dispositive." *United States v. Perales*, 886 F.3d 542, 546 (5th Cir. 2018). The Court addresses each factor in turn.

### 1. Voluntariness of Custodial Status

Brenton Freeney did not voluntarily consent to his custodial status. He was handcuffed and detained beside the vehicle by three officers when law enforcement asked for consent. This factor therefore weighs in favor of Movants. However, custody does not preclude voluntary consent. *See, e.g.*, *Malagerio*, 49 F.4th at 917 (finding no error where the defendant's "custodial status was not voluntary, but most or all of the remaining factors tilt[ed] in favor of the search's being voluntary). "The fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976). The Court therefore moves to the remaining factors.

### 2. Coercive Police Procedures

Coercive police procedures include "threats of force, promises, trickery, or deceit designed to pressure a suspect into consenting to searches." *United States v. Alkheqani*, 78 F.4th 707, 720 (5th Cir. 2023) (citing *Watson*, 423 U.S. at 424). Coercive police procedures also include "more subtle forms of coercion that might flaw [the suspect's] judgment." *Id.* (citation modified) (quoting *Watson*, 423 U.S. at 424). At the same time, "some gamesmanship" by officers is not coercive when it is not "the kind of trickery designed to put pressure on [the suspect] to consent or impair his judgment." *Id.* at 721 (citation modified).

Movants argue that law enforcement acted coercively because Brenton Freeney (1) was not told he could deny consent; (2) was asked to consent multiple times; and

(3) was told his consent was irrelevant because law enforcement were getting into Room #726 "either way." Doc. No. 67 at 8. Movants' first two points carry little weight under this factor. That no one told Brenton Freeney he could refuse goes to his awareness of that right, which is the fourth factor and is addressed below. Additionally, asking for consent more than once is not coercive without more. For instance, in *United States v. Barber*, the Fifth Circuit found nothing coercive in officers renewing a request for consent hours after it was refused; in fact, the court observed that asking for consent "undercuts the argument that the police were coercive." 124 F.4th 354, 359 (5th Cir. 2024) (quoting *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1998)). Here, the TFO repeated his request once, within just a few seconds of the first, and the repetition was not itself coercive.

The "either way" statement is Movants' strongest point and weighs in their favor. An officer who tells a suspect that a search will happen regardless of his answer "announces in effect that the occupant has no right to resist the search," a situation "instinct with coercion." *See Bumper*, 391 U.S. at 550 (holding consent invalid where an officer falsely claimed to have a search warrant and the occupant responded, "Go ahead"). However, the Fifth Circuit treats an officer's statement about what will happen if the suspect refuses as "but one factor to be considered among the totality of the circumstances." *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997). For example, in *Tompkins*, a police officer told a suspect that officers would obtain a search warrant if the suspect did not consent to a search and that the suspect would be denied

access to his motel room in the meantime. *Id.* at 119. Even so, the court found no clear error in the district court's finding that the consent was voluntary, reasoning that the officer's choice of words weighed "only slightly in favor of a coercion finding." *Id.* at 122–23.

*Tompkins* is not identical to this case. The officer there told the suspect he could refuse, and said only that officers would get a warrant—not that officers would go in "either way." *See id.* at 119. The statement here was closer to a claim of present authority to enter, so it carries more weight. Two findings, however, temper that weight. First, the statement was not a bluff or a pretext designed to induce submission. The TFO credibly testified that he genuinely feared that someone inside might have overdosed because a young infant and several adults had overdosed previously on fentanyl traced to Defendants, *see* Doc. No. 77 at 73–76, and the officers did what the TFO said they would do: they entered only to look for people, left, and sought a warrant. Second, the statement was the only coercive feature of an otherwise non-coercive encounter. Law enforcement did not threaten Brenton Freeney with force and made no false promises. Law enforcement did not draw weapons on Brenton Freeney; spoke in a respectful tone; spoke in an open area; and the exchange lasted only a few minutes. The officers also told Brenton Freeney why they needed to get into the room: to ensure no one inside was overdosing on drugs connected to Room #726. *See Barber*, 124 F.4th at 359 ("There's nothing wrong with police officers truthfully informing citizens about ongoing dangers.").

While the Court is wary that some gamesmanship may be at play, the undersigned concludes that this factor is neutral. Although law enforcement told Brenton Freeney that they would enter Room #726 "either way," they did not threaten him with force, did not make false assurances, spoke in a respectful tone in an open area, and spoke with him for only a few minutes.

**3. The Extent and Level of Defendant's Cooperation**

"Cooperation by the defendant is a factor favoring a finding that consent was voluntary. Even if a defendant expresses several instances of being nervous, this factor weighs in favor of voluntariness if the defendant is more cooperative than not." *Alkheqani*, 78 F.4th at 721 (citation modified). The record here shows that Brenton Freeney answered law enforcement's questions politely, told officers where the room key was, told them no one was inside, and there is no indication that he was combative or obstructive. This factor weighs in favor of the Government.

**4. Defendant's Knowledge of Right to Refuse Consent**

"An officer's failure to inform a suspect that he has a right to refuse to consent to a search militates against voluntariness." *Soriano*, 976 F.3d at 457 (citing *United States v. Shabazz*, 993 F.2d 431, 438–39 (5th Cir. 1993)). However, "experience in the criminal justice system can offset any weight accorded to an officer's failure to advise a suspect of his right to resist a search." *Id.* (citation modified) (citing *United States v. Ponce*, 8 F.3d 989, 998 (5th Cir. 1993)). Law enforcement here did not advise Brenton Freeney that he could refuse consent. Brenton Freeney's criminal history, however,

reflects five prior arrests, each of which resulted in a conviction. *See* Brenton Freeney Bond Report at 1–2 (pages 1–3 admitted at the suppression hearing); Doc. No. 77 at 110–112 (admitting bond report for purposes of evaluating Brenton Freeney's experience with law enforcement). Based on this record, the Court finds that Brenton Freeney had "enough familiarity with the criminal justice system to result in his knowledge of the right to refuse consent." *Soriano*, 976 F.3d at 457 (citing *Ponce*, 8 F.3d at 998); *accord Ponce*, 8 F.3d at 998 (affirming district court's finding of voluntariness based on defendant's "three prior convictions and consequent experience with law enforcement procedures" which functioned to "offset any weight accorded to an officer's failure to advise a suspect of his right to resist a search"); *Soriano*, 976 F.3d at 457 (looking to the defendant's presentence report to evaluate this factor). This factor weighs in favor of the Government.

### 5. Education and Intelligence

"The better the defendant understands the situation, the more likely his consent is voluntary." *United States v. Alkheqani*, No. 4:20-CR-0124-Y, ECF No. 54, at 10 (N.D. Tex. Jan. 13, 2021) (Means, J.), *aff'd in part, rev'd in part on other grounds*, 78 F.4th 707 (5th Cir. 2023). At the time of his arrest, Brenton Freeney was 38 years old. Bond Report at 1. He was a licensed box-truck driver; he had previously graduated from high school; and when speaking with officers, he was responsive and clearly understood their questions and instructions. Doc. No. 77 at 114, 118, 121. These circumstances suggest

that Brenton Freeney possessed sufficient education and intelligence to understand the situation and voluntarily consent to a search.

Movants argued at the suppression hearing that Brenton Freeney lacked the mental capacity to consent because of a mental disability. Doc. No. 77 at 98, 111, 115–16, 122, 127. In support, Movants emphasized that Mr. Freeney receives Social Security benefits based on a mental disability. *Id.* at 98. Movants' argument is significant, as the Fifth Circuit held in *United States v. Elrod* that "no matter how genuine the belief of the officers is that the consenter is apparently of sound mind and deliberately acting, the search depending on his consent fails if it is *judicially determined* that he lacked mental capacity." 441 F.2d 353, 356 (5th Cir. 1971) (citation modified). Valid consent must be "the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." *Id.* at 355–56.

The record here is materially different from *Elrod*. There, the consenting party had a long history of mental illness, including repeated hospitalization and a diagnosis of chronic undifferentiated schizophrenia, and was later found incompetent to stand trial; the district court found that he "may or may not have been mentally competent" when he consented. *See Elrod*, 441 F.2d at 354–55. Here, the Government has shown by a preponderance of the evidence that Brenton Freeney had the capacity to consent. Although he received Social Security benefits based on a mental disability, the receipt of such benefits does not, by itself, establish an inability to consent. *Accord United States*

*v. Teijeiro*, 79 F.4th 387, 393 (5th Cir. 2023) (citation omitted) ("[R]eceiving Social Security disability benefits is not tantamount to a medical declaration of incompetency."). His mother's testimony also weighs against finding that he lacked the requisite capacity. At the suppression hearing, she acknowledged that she had told Pretrial Services that Mr. Freeney had not been diagnosed with a mental health disorder. Doc. No. 77 at 115–16. When asked whether his difficulty understanding constituted a mental health disorder or simply a difficulty understanding, she characterized it as the latter. *Id*. She later reaffirmed that Brenton Freeney had never been diagnosed with a mental health disorder. *Id.* at 116, 122.

Considering this testimony alongside the video footage showing that Brenton Freeney understood and responded to law enforcement's questions and instructions, the Court finds that Brenton Freeney "knew what he was doing and had a reasonable appreciation of the nature and significance of his actions" when he consented. *Elrod*, 441 F.2d at 355–56. The Court therefore considers his education and intelligence as part of the totality of the circumstances bearing on voluntariness. *See Schneckloth*, 412 U.S. at 227. On balance, this factor weighs slightly in favor of the Government. Although Brenton Freeney received Social Security benefits based on mental disability, the Government has shown that he had the capacity to understand the situation and to consent voluntarily. His educational background, his mother's testimony regarding the absence of a mental health diagnosis, and his demonstrated understanding of law enforcement's questions and instructions support this conclusion.

### 6. Incriminating Evidence

"An awareness or belief that no incriminating evidence will be found weighs in favor of a finding of voluntariness. Consequently, an awareness or belief that some incriminating evidence will be found weighs against a finding of voluntariness." *Alkheqani*, 78 F.4th at 723 (citing *Soriano*, 976 F.3d at 458). The Motion does not reference any concern about locating incriminating evidence, nor does the Government's Response cover the issue substantively. However, given the distribution quantities of narcotics recovered in Room #726—a room Brenton Freeney occupied and to which he held the key—the Court finds it more likely than not that Brenton Freeney knew incriminating evidence was inside. This factor weighs in favor of Movants.

### 7. Voluntary Consent

Based on the above, the Court finds that the Government has met its burden of showing that Brenton Freeney's consent was voluntary. *See Bumper*, 391 U.S. at 550 (burden of showing voluntary consent is on the Government). Two factors—custody and Brenton Freeney's likely awareness that incriminating evidence was in the room—weigh against voluntariness. The "either way" statement also gives the Court pause. However, voluntariness turns on the totality of the circumstances and not a tally of factors. *See Schneckloth*, 412 U.S. at 227. Brenton Freeney was a 38-year-old high school graduate and licensed box-truck driver who had the capacity to understand the officers' request, and he had substantial experience in the criminal justice system; he was

cooperative throughout; officers did not threaten force, draw weapons, or make false promises; the exchange was brief and respectful; the officers explained why they wanted to go enter Room #726; and the TFO's statement that officers would enter "either way" reflected a genuine, limited plan rather than a pretext designed to overbear Brenton Freeney's will. On this record, the Court finds that Brenton Freeney's consent was the product of his own free choice, not coercion. The Government did not need to obtain a warrant to enter Room #726 under these circumstances. *See Randolph*, 547 U.S. at 106.

**C. Law enforcement did not exceed the scope of Brenton Freeney's consent.**

Having concluded that Brenton Freeney voluntarily consented to law enforcement entering Room #726, the Court must determine whether law enforcement exceeded that consent. "[W]hen law enforcement officers are conducting a warrantless search based on consent, the search must not go beyond the consent." *Gonzales v. United States*, No. 6:16cv18, 2018 WL 6588516, at *7 (E.D. Tex. Apr. 4, 2018) (citing *United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations omitted). "Although objective reasonableness is a question of law, factual circumstances are highly relevant when determining what the reasonable person

would have believed to be the outer bounds of the consent that was given." *United States v. Mendez*, 431 F.3d 420, 426 (5th Cir. 2005) (quoting *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003)) (citation modified).

Furthermore, "it has long been established that law enforcement officers may seize anything they find in plain view without any search warrant. An object falls within the plain view doctrine if law enforcement officers are lawfully in a position from which they view it, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to it." *United States v. Simmonds*, 262 F.3d 468, 470 (5th Cir. 2001) (citation modified).

Before entering Room #726, law enforcement told Brenton Freeney what they wanted to do: go in and "look to make sure there is nobody in there" and "make sure nobody is dying." A reasonable person observing this exchange between law enforcement and Brenton Freeney would conclude that Mr. Freeney authorized a search of Room #726 for people, including anyone who might be dying. A search for people, however, has natural limits. It extends only to places where a person could be, and it ends once officers have confirmed no one is there. *Cf. Maryland v. Buie*, 494 U.S. 325, 335–36 (1990) (protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and "lasts no longer than is necessary"); *Case v. Montana*, 607 U.S. 107, 117 (2026) (emergency-aid entry "provides no basis to search the premises beyond what is reasonably needed to deal with the emergency"); *United States v. Fields*, 131 Fed. App'x 42, 45 (5th Cir. 2005) (per curiam) ("Once the

door-unlocking mission was accomplished, the consent to be in the apartment ended."). Officers who see contraband in plain view while acting within those limits may rely on what they see. *See Mendez*, 431 F.3d at 429.

Upon entering Room #726, law enforcement looked for people and found marijuana in plain view. Video footage and testimony reveal that officers performed a methodical search of the premises for people. Officers initially searched the large areas throughout Room #726 and then checked smaller areas that could have concealed a person. During the second pass, an officer saw an open backpack containing marijuana in plain view. Each requirement of the plain-view doctrine is met. The officer was lawfully positioned: he was inside Room #726 with Brenton Freeney's consent and, as explained below, was still looking for people in a place where a person could be. The marijuana's incriminating character was immediately apparent: the baggie was clearly visible in an open backpack, and the TFO testified he could smell marijuana upon entering the room. Doc. No. 77 at 85. And no officer opened, moved, or manipulated the backpack to see what was inside. *See Hicks*, 480 U.S. at 324-25.

Movants argue that the marijuana found in Room #726 must be suppressed because it was discovered after law enforcement's search for people concluded. Put another way, Movants claim the search exceeded the scope of consent. The Court disagrees. As found above, the far end of the living room had not yet been checked when the officer walked to it, and it was large enough to conceal a person. Further, officers looking for someone who may be unconscious need not treat a glance from

across a room as conclusive, and checking the larger, open areas first and then returning to the remaining spaces was a reasonable way to conduct the search. *See Mendez*, 431 F.3d at 426–27. Because officers knew that a young infant had overdosed on fentanyl traced to Defendants at a Kaufman, Texas residence, *see* Doc. No. 77 at 74, it was also reasonable to check spaces too small to conceal an adult. Because the search for people had not yet concluded when the officer saw the marijuana, he was lawfully positioned when he saw it.

For these reasons, the Court finds that law enforcement did not exceed the scope of Brenton Freeney's consent. Instead, law enforcement conducted a valid search for people pursuant to Mr. Freeney's consent and saw marijuana in plain view. The evidence found in Room #726 was therefore not obtained in violation of Movants' Fourth Amendment rights, and the Court need not reach the Government's alternative argument that exigent circumstances justified law enforcement's entry.

## III. Conclusion

The Court has carefully considered the Motion to Suppress, Response, testimony and exhibits admitted at the suppression hearing, applicable law, and relevant portions of the record. In resolving the Motion to Suppress, the Court has stated its essential findings. *See* FED. R. CRIM. P. 12(d). Having done so, the Court concludes that the evidence found in Room #726 will not be suppressed because Brenton Freeney voluntarily consented to officers' entry into the room, and because

officers saw contraband in plain view while acting within the scope of that consent. The Motion to Suppress is **DENIED**.

**SO ORDERED.**

Signed November 12th, 2026.

Ed Kinkeade

ED KINKEADE
UNITED STATES DISTRICT JUDGE